IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARK RONALD NEW,

              Petitioner,

    v.

RICK COURSEY,

              Respondent.

Civil No. 2:11-cv-00999-AC

FINDINGS AND RECOMMENDATION

ANTHONY D. BORNSTEIN
Assistant Federal Public Defender
101 SW Main Street
Suite 1700
Portland, OR  97204

        Attorney for Petitioner

ELLEN F. ROSENBLUM
Attorney General
NICK M. KALLSTROM
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301

        Attorneys for Respondent

1 - FINDINGS AND RECOMMENDATION -

ACOSTA, Magistrate Judge.

Petitioner, an inmate at the Eastern Oregon Correctional Institution, brings this habeas corpus action pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Petition for Writ of Habeas Corpus (#2) should be DENIED.

**BACKGROUND**

On July 10, 2001, a Linn County grand jury indicted Petitioner on charges of Kidnapping in the First Degree, Unlawful Use of a Weapon, Menacing, Robbery in the First Degree, Assault in the Fourth Degree, Attempted Sodomy in the First Degree, and Attempted Aggravated Murder. Resp. Exh. 102, pp. 1-3. The case was tried to a jury.

At trial, Oregon State Trooper Craig Flierl testified that on June 28, 2001, at approximately 10:00 p.m., he received a call that an accident had occurred on Highway 20, east of Albany. Flierl drove up Highway 20, and while en route to the reported accident he encountered Petitioner walking on the side of the road. Petitioner told Trooper Flierl that his car was stuck in a ditch near a logging road where he had been camping alone. Trooper Flierl offered Petitioner a ride to a payphone in his patrol car, but told Petitioner he would first have to pat him down for weapons. Trooper Flierl asked Petitioner if he had any weapons on him, and Petitioner replied that he did. Trooper Flierl found a loaded .357 caliber five-shot revolver in Petitioner's coat pocket with three live rounds and two empty cylinders.

Trooper Flierl read Petitioner his *Miranda* rights and arrested Petitioner for unlawful possession of a weapon. Trooper Flierl asked Petitioner where his truck was to ensure that it was not a hazard to others. Petitioner gave accurate directions to where the truck was located, but

because of the location and conditions Trooper Flierl decided not to chance getting his patrol car stuck, and instead transported Petitioner to the Sweet Home police station. While preparing to transfer Petitioner to the Linn County Jail, Trooper Flierl received a report that Albany police were looking for a man named "Mark" regarding an incident involving a person named Andrew Hilton, and realized Petitioner was a suspect in a more serious crime.

Andrew Hilton, the victim, testified that on June 28, 2001, Petitioner and another man, Darren Hopkins, arrived at Hilton's apartment, and Hopkins asked Hilton to go with Petitioner to buy some drugs. Hilton took with him his wallet, keys, a cellular phone, a digital scale, and approximately $200 to $250.

Hilton testified that Petitioner drove his truck, and during the drive Hilton asked where they were going and who they were meeting. Petitioner then pulled out a gun and pointed it at Hilton. Petitioner drove past Sweet Home and turned onto Sheep Creek road, and then onto a service road, where he pulled over. It appeared to Hilton that Petitioner had the directions to the location written down on a piece of paper affixed to the truck's sun visor.

According to Hilton, Petitioner ordered Hilton out of the truck, and pulled out black plastic twist ties and told Hilton to put them on his wrists. Hilton put on one his left wrist and Petitioner put one on Hilton's right wrist and then fastened Hilton's hands together. Petitioner then ordered Hilton to the ground and hit Hilton in the back of the neck with the gun. Petitioner used more of the black twist ties to secure Hilton's hands to a log on the side of the road. Hilton testified that when he asked Petitioner why he was doing this, Petitioner told Hilton he had been paid $10,000 to kill Hilton because Hilton "ratted on" someone.

After securing Hilton to the log, Petitioner took Hilton's wallet, keys, and cellular phone and placed them in his truck. Petitioner told Hilton "You're going to tell me who you ratted to or I'm going to kill you." Petitioner then pulled down Hilton's shorts and told Hilton that if he wasn't going to talk, he was going to get "fucked like [Hilton] fucked somebody else." Petitioner then went to his truck, and when he returned Hilton saw he was wearing rubber gloves and had a box of condoms and a tube of lubricant in his hands.

When Hilton saw what Petitioner was carrying, he snapped the plastic bands off the log and took off running with his hands still tied together. Petitioner grabbed the gun from the truck, and as Hilton ran, he heard the gun go off and saw a bullet strike the ground in front of him. He then turned his shoulder and saw Petitioner taking aim. Hilton continued running and heard a second shot.

Hilton testified he ran for approximately a mile before hiding in some leaves off to the side of the road. He estimated he stayed hidden for two or three hours, during which time he was able to chew the plastic ties off his wrists. Hilton eventually walked out and hitched a ride with a truck driver back to Albany, where Hilton called the police to report the crime.

During Hilton's testimony, he admitted that he had lived with Hopkins in the past, and that they had both been drug dealers. When questioned about his criminal history, Hilton initially stated he had only one prior conviction for burglary. After the prosecutor challenged him, however, Hilton admitted he had four additional prior convictions related to the manufacture and distribution of methamphetamine. Hilton also admitted that, at the time of his testimony, he was incarcerated for a probation violation. On cross-examination, Hilton denied he had ever owned any firearms and

4 - FINDINGS AND RECOMMENDATION -

maintained that he was not a violent person. However, Hilton admitted that during the course of his drug dealings he had hired people with weapons or purchased weapons for them "so they could carry them beside me."

Hilton also admitted on cross-examination that he "was not a big fan" of the justice system, noting: "I feel that many times people are made to pay way too much." When asked whether he had been forced to pay way too much, Hilton responded "many a time." Finally, Hilton also admitted to the jury that he asked to speak to Petitioner's parents prior to the trial so he could offer to withhold his testimony in exchange for money.

Albany police officer Michael Harmon testified that he responded to Hilton's call for help at about 1:50 a.m. the morning of June 29, 2001. Officer Harmon said Hilton was upset and dirty, and that he had two black plastic twist ties that he told Officer he had chewed off his wrists. Officer Harmon observed red abrasions around both of Hilton's wrists and a red mark on the back of Hilton's neck. Hilton was wearing shorts and a red fleece sweatshirt.

Detective Randy Voight testified that he met with Hilton at the Linn County Sheriff's Office at 3:30 a.m., and that his partner Detective Keith Leopard arrived quite some time after he did. Detective Voight also observed red marks on Hilton's wrists and neck, and observed that Hilton's shins were scraped.

After interviewing Hilton, Detective Voight met with Trooper Flierl at the Sweet Home Police Department and obtained the location of Petitioner's truck. Voight went to the scene in the woods and found the truck in a ditch off the roadway. Inside the truck's cab, he could see a roll of duct tape, a plastic bag containing zip ties, and a package of condoms. Along the road he observed

a log with a zip tie attached to it, and noted that the ground in front of the log appeared "disheveled." Approximately 50-100 yards from the log, Detective Voight found strips of duct tape with red fuzz attached to it.

Detective Voight impounded the truck and had it towed to Albany. Later that day, after obtaining a warrant, Petitioner searched the truck. In addition to the items he had seen through the window, Detective Voight found a bottle of "adult lubricant," and attached to the visor he found a notepad with directions from Sweet Home to the location where the truck was found. In the bed of the truck, Detective Voight found several items, including a box of latex gloves, a box of .357 ammunition with five rounds missing, a shovel that appeared to have never been used, and a roll of plastic.

Oregon State Police criminalist Bradford Putnam testified that he analyzed the strips of duct tape found near Petitioner's truck. He compared the strips and the roll of duct tape from Petitioner's truck and concluded the tear marks at the end of one of the strips were consistent with the tear marks at the end of the roll. He also microscopically compared the red fibers attached to the strips of duct tape with fibers from Hilton's sweatshirt, and concluded they were consistent.

Petitioner testified in his own defense. He testified that on June 28, 2001, Hopkins offered him money to kill Hilton. Petitioner stated that he responded by telling Hopkins he did not want any money, but that he would "take care of the situation." According to Petitioner, Hopkins told him that if Hopkins could not find anyone to kill Hilton, Hopkins would have his cousins do a drive-by shooting or plant an explosive device. Petitioner testified that he was worried about innocent bystanders and especially his friends and children, so he intended to take Hilton away and

tell him he needed to leave town.  Petitioner explained that he "was prepared to offer him bus fare

and motel fare at the time to the extent that I was carrying a large amount of cash."  Petitioner said

he did not intend to harm Hilton.

Petitioner testified that he picked Hilton up at Hilton's apartment and after Hopkins told

Hilton he needed to go with Petitioner to help with a drug deal, Petitioner drove to the spot in the

woods, where Petitioner claimed he had gone camping in the past.  Petitioner testified that once

they both got out of the truck, he told Hilton: "[l]ook – look, [Hilton], people think you've been

fucking up and people, frankly, want you dead.  There's a contract on you.  And to be honest with

you, people have offered me money to kill you."

Petitioner testified that after he told Hilton this, Hilton pulled out a gun.  Petitioner stated

he slammed Hilton into the truck, disarming him as the gun fell to the ground.  Petitioner said that

he then got his own gun out of the truck and decided to get rid of Hilton's gun.    Petitioner

explained:

> I went to reach for his gun–and I had my gun in my right hand–and I went to reach
> for his gun and then I said, "No, he's a felon.  This is probably a stolen gun.  I don't
> want my fingerprints on it."  So at that time I opened the back of my canopy up in
> my truck, got out some rubber gloves that I keep in there for various purposes, and
> put them on.  Once I had them on, I put my gun in my pocket, had his gun out, I
> removed the magazine, checked the chamber to make sure it was empty and then
> I chucked both of them into the woods."

Petitioner testified that after getting rid of Hilton's gun he decided he would be safer if he

restrained Hilton, so he tied Hilton's hands with black twist ties.  Then Petitioner tied Hilton to a

nearby log because he wanted to search Hilton for additional weapons.  Hilton continued to

struggle, so Petitioner said he used more twist ties to anchor Hilton's feet to the log.  Petitioner

searched Hilton's pockets, and acknowledged that while he was doing so Hilton's shorts fell down, but testified that his underwear stayed up. Petitioner denied that he attempted to sodomize Hilton, but he admitted he told Hilton "[y]ou know, if you don't shut up, I'm going to shove my gun up your ass." Petitioner said he removed a wallet, phone, keys, a small knife, and some papers from Hilton's shorts and left them all on the ground near Hilton, except the papers because, Petitioner testified, he is "very much against littering."

Petitioner testified that as he was getting ready to leave Hilton there in the woods, Hilton broke free from the log and demanded a ride back to town. Petitioner said he pointed his gun in Hilton's "general direction" and refused Hilton's request. Petitioner testified Hilton then took off running down the road, but when he stopped running after 25 or 30 feet Petitioner pointed his gun into the air and fired it twice. Petitioner claimed he did so because it looked like Hilton was going to turn around and try to talk Petitioner into giving him a ride, and Petitioner "was completely sick of dealing with him." Petitioner stated that he got back in his truck, and as he was backing down the road he got stuck, so he decided to walk down to the highway.

Petitioner denied that he ever retrieved condoms or lubricant from his truck, denied that he ever hit Hilton on the neck, and denied that he taped Hilton's mouth. Petitioner admitted he had no explanation for the strips of duct tape found at the scene with the fibers from Hilton's sweatshirt. He speculated that Hilton went back later, put the duct tape strips on his sweater, and then threw them on the ground. Petitioner also conceded that he had lied to Trooper Flierl when he told him he had been camping and target shooting when his truck had gotten stuck.

Petitioner's trial attorney called two witnesses to impeach Hilton. Patricia Richmond testified that Petitioner had dated her daughter. Richmond testified that she had been to Hilton's house about 20 times and that she had observed Hilton in possession of a handgun. She also testified that Hilton had a reputation in the community for being untruthful. Richard Middlebrooks similarly testified that, in his opinion, Hilton was not very truthful at all.

The jury convicted Petitioner of all charges except one; they acquitted Petitioner on the charge of Attempted Sodomy in the First Degree. The trial judge sentenced Petitioner to a total of 210 months of imprisonment.

Petitioner appealed, but appellate counsel filed a *Balfour*[1] brief, and Petitioner did not file a section B brief. The Oregon Court of Appeals affirmed without opinion. *State v. New*, 190 Or. App. 583, 79 P.3d 197 (2003). Petitioner did not seek review from the Oregon Supreme Court.

Petitioner then filed a petition for state post-conviction relief ("PCR"). Following an evidentiary hearing, the PCR trial judge denied relief. Petitioner appealed, but the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. *New v. Kilmer*, 241 Or. App. 723, 250 P.3d 992, *rev. denied*, 350 Or. 571, 258 P.3d 526 (2011).

On August 18, 2011, Petitioner filed his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 in this Court. In his Petition, he alleges five grounds for relief, with multiple claims

---

[1]The *Balfour* procedure provides that counsel need not ethically withdraw when faced with only frivolous issues. Rather, the attorney may file Section A of an appellant's brief containing a statement of the case sufficient to "apprise the appellate court of the jurisdictional basis for the appeal." *State v. Balfour*, 311 Or. 434, 451, 814 P.2d 1069 (1991). The petitioner may then file the Section B segment of the brief containing any assignments of error he wishes. *Id.* at 452.

contained in each ground. This Court appointed counsel to represent Petitioner. In the Brief in

Support of Petition for Writ of Habeas Corpus, Petitioner addresses only three of the claims for

relief alleged in the Petition: (1) the state violated Petitioner's Fourteenth Amendment right to due

process when it suppressed material evidence impacting the victim's credibility; (2) trial counsel

was ineffective in failing to challenge the admission of evidence found during the search of

Petitioner's truck; and (3) trial counsel was ineffective in failing to thoroughly investigate the

victim's background and in failing to impeach the victim with his conviction for Escape in the

Second Degree.

Respondent acknowledges that Petitioner fully exhausted the three claims address in the

Brief. However, Respondent argues, Petitioner is not entitled to habeas corpus relief because the

PCR court's decision was not contrary to or an unreasonable application of clearly established

federal law. With respect to the remaining claims alleged in the Petition but not addressed in

Petitioner's Brief, Respondent argues Petitioner failed to meet his burden of demonstrating why he

is entitled to relief.

## LEGAL STANDARDS

Under the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an

application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state

court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of,

clearly-established federal law, as determined by the Supreme Court of the United States" or (2)

was "based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" federal law under the AEDPA if it either fails to apply the correct Supreme Court authority or applies the correct controlling authority to a case involving "materially indistinguishable" facts but reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405–07, 413 (2000). Similarly, a state court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citations omitted).

An unreasonable application of federal law is a different than an incorrect application of federal law. *Hibbler v. Benedetti*, 693 F.3d 1140, 1148 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 1262 (2013). "'[T]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Id.* at 1146 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Moreover, the state court's findings of fact are presumed correct, and a petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

**I.    *Brady* Claim**

Petitioner alleges that the State failed to disclose evidence that could have been used to impeach Hilton's credibility. In support of his claim, Petitioner identifies the following evidence: (1) a letter from Hilton's mother, Marie Williams; (2) a pending charge in another county against Hilton for Assault in the Fourth Degree; (3) the circumstances leading to that assault charge; (4) an alleged "favor" performed on behalf of Hilton by the prosecutor, in which the prosecutor notified

a trial court that Hilton had appeared late for a probation hearing and that an arrest warrant issued earlier that day could be withdrawn; and (5) Hilton's prior conviction for Escape in the Second Degree. Petitioner argues that, collectively, the undisclosed impeachment evidence undermines confidence in the outcome of his criminal trial.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). For a *Brady* claim to succeed, (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) that evidence must have been suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice must have ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Under *Brady*, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result." *Strickler*, 527 U.S. at 281. In making that determination,

the allegedly suppressed evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436.

Here, the evidence of Petitioner's guilt was overwhelming. The evidence Petitioner has identified as *Brady* material, assuming the prosecutor withheld it from Petitioner, would not have made Petitioner's version of events any more believable. To the extent the evidence could have been used to impeach Hilton's credibility, it would have had little additional impact. Hilton was thoroughly discredited at Petitioner's trial: he admitted to a prior burglary conviction and several drug convictions, he admitted he was a drug dealer who purchased firearms for his fellow drug dealers, he admitted he was not a big fan of the justice system because he had been forced to pay "way too much" many a time, and he admitted that the day before trial he intended to offer to withhold his testimony against Petitioner in exchange for money from Petitioner's parents. The jury was given ample reason to question Hilton's credibility, and the *Brady* evidence cited by Petitioner would not have changed the jury's decision to believe Hilton's version of the events in question over those described by Petitioner.

Given the overwhelming evidence of Petitioner's guilt, even if the State failed to turn over the evidence cited by Petitioner, there was no reasonable probability that the evidence would have changed the outcome of Petitioner's trial. Accordingly, the PCR court reasonably applied *Brady*, and that determination is entitled to deference. Because the PCR court's decision was neither contrary to nor an unreasonable application of *Brady* and its progeny, Petitioner is not entitled to relief on this claim.

## II.    Ineffective Assistance of Counsel Claims

Petitioner alleges trial counsel provided constitutionally ineffective assistance in two respects. First, Petitioner argues trial counsel should have challenged the search warrant for his truck on the basis that the trial court signed the warrant before the police applied for the warrant. Second, Petitioner argues trial counsel failed to impeach Hilton with his prior conviction for Escape in the Second Degree.

To prevail on a claim of ineffective assistance of counsel, a petitioner must prove: (1) counsel's performance fell below an objective standard of reasonableness and, (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Bell v. Cone*, 535 U.S. 685, 695 (2002); *Williams*, 529 U.S. at 390–91. A "reasonable probability" requires a substantial, not just conceivable, likelihood of a different result. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011). Failure to make the required showing on either prong defeats the ineffectiveness claim. *Strickland*, 466 U.S. at 697.

For the performance prong, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Moreover, "a court must indulge [the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 131 S.Ct. at 1407 (quoting *Strickland*) (internal quotation marks omitted). The reasonableness of counsel's conduct must be evaluated in light of the facts of the case and the circumstances at the time of representation. *Strickland*, 466 U.S. at 690.

A doubly deferential standard of review applies to federal habeas review of ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420 (2009); *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (deference under § 2254 and deference under). Petitioner must prove that there is no reasonable argument that counsel satisfied *Strickland's* deferential standard. *Premo v. Moore*, 131 S.Ct. 733, 740 (2011); *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011).

## A.    Failure to Challenge Admission of Evidence

Prior to trial, counsel moved to suppress all of the contents located in Petitioner's truck on the basis that the information used to learn the location of the truck and to obtain the warrant was derived from the a custodial interrogation of Petitioner before he was read his *Miranda* rights. The trial court rejected that motion. In his state PCR proceeding, Petitioner argued the claim asserted here, that trial counsel should also have challenged the search warrant on the basis that the trial judge signed the warrant before the police applied for the warrant. The PCR court rejected this claim.

The warrant at issue described Petitioner's truck and listed the truck's license plate number and VIN. The warrant noted the truck was located at All-Rite Towing in Albany, Oregon. The warrant indicates that the issuing judge signed it at 3:29 a.m. on June 29, 2001. However, Detective Voight testified that he received the phone call requesting his assistance in the case at about 3:00 a.m. on June 29, 2001, and that he arrived at the Linn County Sheriff's Office at 3:15 a.m. Voight's partner, Detective Leopard, who prepared the affidavit in support of the search warrant arrived "quite some time after" Detective Voight.

The Detectives did not drive to the service road where Petitioner's truck was located until sometime after 6:00 a.m., and the truck was not towed to Albany until 8:22 a.m. that morning. Detective Voight testified that they executed the search warrant and searched the truck at 3:45 p.m.

It is beyond improbable that the trial judge signed the search warrant before Detectives Voight and Leopard had the opportunity to question Petitioner, locate the truck and have it towed to Albany, and prepare an Affidavit requesting the warrant. Given the time-line the Detectives testified to, the time the search warrant was executed, and the location of the vehicle noted in the warrant, it appears highly likely that the warrant was signed by the judge at 3:29 *p.m.*, and the 3:29 a.m. notation was simply a scrivener's error. Indeed, as Petitioner noted in his trial memorandum to the PCR court, a similar mistake was made on an envelope signed by the judge who issued the warrant, but on the envelope the "A.M." was crossed out and corrected to "P.M."

Trial counsel was not constitutionally ineffective in failing to challenge the warrant on the basis that the issuing judge inaccurately indicated the time that he signed the warrant, because any such challenge would not likely have been successful. *See State v. Dalton*, 132 Or. App. 36, 39, 887 P.2d 379 (1994) (concluding that "the misdating of [a] warrant was simply a scrivener's error" and that "we cannot say that the inadvertent misdating of an otherwise facially valid search warrant requires suppression"), *rev. denied*, 321 Or. 94, 893 P.2d 540 (1995); *see also State v. Radford*, 223 Or. App. 406, 409-11, 196 P.3d 23 (2008) (finding that the omission of the year on a search warrant was "a mere scrivener's error" and concluding that "[t]here is no explicit constitutional requirement for a particularized date or, for that matter, any date at all), *rev. denied*, 346 Or. 362, 211 P.3d 931 (2009). Because a challenge of the warrant on the basis that it contained the incorrect time would

have failed, the PCR court reasonably applied *Strickland* to find no legal or factual basis to support

Petitioner's claim and in rejecting Petitioner's claim of ineffective assistance of counsel.

Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

### B.    Failure to Investigate and Impeach the Victim

Petitioner also claims trial counsel was constitutionally ineffective for failing to impeach

Hilton with the Escape in the Second Degree conviction. As noted above in addressing Petitioner's

*Brady* claims, however, Hilton's credibility was already thoroughly impeached. Petitioner has not

established that, had counsel investigated, discovered, and presented evidence of Hilton's Escape

in the Second Degree conviction, the outcome of the trial would have been different. Accordingly,

the PCR court decision denying relief on this ineffective assistance of counsel claim was not

contrary to or an unreasonable application of clearly established law, and Petitioner is not entitled

to federal habeas corpus relief.

### III.    Claims Not Addressed in Petitioner's Brief in Support

As noted above, petitioner fails to provide argument to support the numerous remaining

claims alleged in his Petition. Additionally, Petitioner does not attempt to refute Respondent's

argument that these claims do not entitle him to habeas corpus relief. Accordingly, Petitioner has

failed to sustain his burden of demonstrating why he is entitled to relief on his unargued claims.

*See Lambert v. Blodgett*, 393 F.3d 943, 970 n. 16 (9th Cir. 2004) (petitioner bears burden of

proving his case), *cert. denied*, 546 U.S. 963 (2005); *Davis v. Woodford*, 384 F.3d 628, 638 (9th

Cir. 2004) (same), *cert. dismissed*, 545 U.S. 1165 (2005). Nevertheless, the Court has reviewed

his unargued claims and is satisfied that Petitioner is not entitled to relief on the remaining claims alleged in his Petition for Writ of Habeas Corpus.

## IV.    Evidentiary Hearing

Petitioner also asserts that if habeas relief is not warranted on the existing record, the Court should conduct an evidentiary hearing on the disputed issues. Based on the foregoing, an evidentiary hearing is neither necessary nor in the interests of judicial economy. *See Landrigan*, 550 U.S. at 474 (where the record in the case precludes habeas relief, a district court is not required to hold an evidentiary hearing). Accordingly, Petitioner's alternative request for an evidentiary hearing is denied.

## RECOMMENDATION

For the reasons set forth above, the Petition for Writ of Habeas Corpus should be DENIED, and a judgment of DISMISSAL should be entered. A certificate of appealability should be DENIED as Petitioner has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due January 5, 2015. If no objections are filed, review of the Findings and Recommendation will go under advisement that date.

A party may respond to another party's objections within 14 days after the objections are filed. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or on the latest date for filing a response.

DATED this 18th day of December, 2014.

John V. Acosta
United States Magistrate Judge